IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER MENDOZA, Individually, | § | |
| and a/n/f of A.M., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 09-cv-3895 |
| | § | JURY DEMAND |
| KLEIN INDEPENDENT SCHOOL | § | |
| DISTRICT, W. SCOTT CROWE and | § | |
| STEPHANIE LANGNER, in their | § | |
| official and individual capacities, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Klein Independent School District ("KISD"), W. Scott Crowe ("Crowe"), and Stephanie Langner ("Langner") (collectively, "Defendants") make this Motion for Summary Judgment as follows:

## I.
## Introduction

This dispute arises from a school administrator's search of a middle school student's cell phone. In addition to suing KISD, Plaintiffs have also sued Defendants Crowe and Langner in their official and individual capacities. Crowe is the principal and Langner the associate principal of Krimmel Intermediate ("Krimmel"), located within the KISD.

On November 11, 2009, Langner conducted a limited search of A.M.'s cell phone based on a reasonable suspicion that the search would lead to the discovery of a rule

1

violation.[1]  During the course of Langner's search, she found a nude photo of A.M. that had been sent from the phone via text message.  A.M. subsequently admitted to having shown text messages containing nude photos of a young man's genitalia to other students while at school.  In light of this serious rule violation, Crowe assigned A.M. to the District's Alternative Education Program ("DAEP") for thirty days, a decision that was upheld on administrative appeal.

Plaintiffs allege that Defendants violated their constitutional rights pursuant to 42 U.S.C. 1983 and the Fourth Amendment.  Plaintiffs further allege negligence and the intentional infliction of emotional distress with respect to Langner and Crowe.

As demonstrated below, the summary judgment evidence demonstrates that Langner's search of A.M.'s phone was reasonable under the circumstances, and that, in any event, the individual Defendants are entitled to immunity from Plaintiffs' claims.  Furthermore, Plaintiffs cannot establish that any KISD policy or custom was the moving force behind the claimed constitutional violations, nor can they show deliberate indifference.  Because Plaintiffs cannot establish a genuine issue of material fact with respect to any of their claims, Defendants are entitled to summary judgment.

## II.
## Standard of Review

Summary judgment is authorized if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The United States Supreme Court has interpreted this rule to mandate the entry of

---

[1] "A.M." is used in place of the student's name due to privacy regulations.

summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once a movant submits a properly supported motion for summary judgment, the non-movant must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and 'designate specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Conclusory allegations and unsubstantiated assertions are insufficient to satisfy the non-movant's burden. *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citation omitted). If "significant probative" evidence indicating that there is a triable issue of fact is not produced, the court cannot assume that the non-movant could or would prove the necessary facts, and summary judgment is warranted. *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir. 1994); *Little,* 37 F.3d at 1075 (citations omitted).

## III.
## Factual Background

A.M. was a thirteen year old eighth grader for the 2009-2010 school year at Krimmel. *See* Deposition of A.M., attached as Exhibit A, at pp. 5-6. On Wednesday,

November 11, 2009, during the passing time between 2nd and 3rd period (approximately 10:45 a.m.), Stephanie Langner, Associate Principal at Krimmel, noticed a group of seven to ten students huddled together in the hallway looking at something.  *See* Affidavit of Stephanie Langner, attached as Exhibit B, at p. ¶ 4; Deposition of Stephanie Langner, attached as Exhibit C, at pp. 10-11; Ex. A at pp. 10-11.  As Langner approached, she saw that A.M. had a device in her hand, which she believed to be a cell phone, and that the other students were looking at it.  *See* Ex. A at pp. 11-12; Ex. B at p. ¶ 4; Ex. C at p. 10-11.  When the students saw Langner, A.M. immediately started to put the phone away, and the students who were huddled around her quickly moved on.  *See* Ex. A at p. 13; Ex. B at ¶ 4; Ex. C at p. 11-12.  Langner then asked A.M. to give her the phone.  *See* Ex. A at pp. 13-14; Ex. B at ¶ 4; Ex. C at p. 12-13.  A.M. became very upset and began to plead with Langner not to take her phone.  *See* Ex. A at pp. 14-15; Ex. B at ¶ 4; Ex. C at p.13:1-13.  As A.M. continued to plead with Langner, Langner slowly escorted A.M. toward the eighth grade office, which was close to their original location, in order to minimize the disruption in the hall.  *See* Ex. A at pp. 14-15; Ex. B at ¶ 4; Ex. C at p. 13-14.

When they arrived at the office, Langner again asked A.M. to give her the phone, and A.M. complied.  *See* Ex. A at pp. 14-15; Ex. B at ¶ 5; Ex. C pp. 13-14.  A.M. was still very upset, and continued to plead with Langner to return her phone to her.  *Id.*  A.M. denied having used her phone and pleaded with Langner to ask A.M.'s friends whether she had been using her phone.  *See* Ex. B at ¶ 5; Ex. C at pp. 14-15.  Langner told A.M. that she would talk with her friends, and asked her for their names.  *Id.*  Langner also told A.M. that she was going to check the phone to determine whether it was being used by

A.M. in the hallway.  *See* Ex. B at ¶ 5; Ex. C at p. 15:17-21.  Langner then sent A.M. to class.  *See* Ex. B at ¶ 5; Ex. C at 15-16.

Because Langner had seen (1) A.M. holding a cell phone; (2) a group of students huddled around A.M. and her phone; (3) the group of students run off when they saw her; and (4) A.M.'s extreme reaction after she confiscated the phone, Langner had a reasonable suspicion that A.M. had been using the phone, despite A.M.'s denials to the contrary.  *See* Ex. B at ¶ 6; Ex. C at pp. 14-15; Deposition of Scott Crowe, attached as Exhibit D, at p. 14-15.  Langner therefore reasonably decided that she should check the phone's text message sent folder to determine if A.M. had been using the phone during school hours that day, which would have been a violation of the KISD Student Handbook's rules regarding cell phone use.[2]  *See* Ex. B at ¶ 6; Ex. C at pp. 14-16, 18; KISD Student Handbook, attached as Exhibit B-3, at p. 44; Deposition of Jennifer Mendoza, attached as Exhibit E, at pp. 17-18.  When Langner looked at the phone, she noticed that there were several text messages in the sent folder.  *See* Ex. B at ¶ 7; Ex. C at pp. 18-23.  In the process of attempting to find the most recent text in the sent folder, Langner discovered a text containing a nude frontal photo of A.M. that appeared to have been taken by A.M. in front of a mirror.  *Id.*  When Langner reached the most recent texts she noticed that A.M. had sent several text messages during school that day.  *Id.*  Langner did not look at the phone further.  *Id.*

---

[2] Based on the A.M.'s and the other students' reaction upon seeing her, Langner also reasonably suspected that what they had been looking at on the phone would probably be inappropriate for a school setting. Ex. B at ¶ 6. However, the purpose of the search was to determine whether A.M. had been using her phone that day in violation of school policy. *See id.*

At approximately 11:00 a.m., Langner called A.M. back to the office.  *See* Ex. A at p. 16:3-6; Ex. B at ¶ 8; Ex. C at p. 27:7-10.  Langner first confronted A.M. about the fact that she had used the phone at school that day.  Ex. B at ¶ 8.  A.M. admitted that she had used the phone at school that day, but said that she had not been using it in the hallway when Langner saw her.  *Id.*  Langner then asked A.M. about the contents of her phone, and A.M. admitted to taking nude photos of herself and sending them to a male friend.  *See* Ex. A at p. 17:2-8; Ex. B at ¶ 8; Ex. C at pp. 25-26.  A.M. told Langner that she sent the photos because her male friend had sent nude photos to her and he had asked her to send nude photos of herself back to him.  *See* Ex. B at ¶ 8; Ex. C at p. 27-28.  When Langner asked A.M. whether she was showing the nude photos to the students in the hallway, A.M. told her that she was not showing the photos, but instead was showing them a text from her ex-boyfriend.  Ex. B at ¶ 8.  However, when Langner asked A.M. whether she had ever shown the pictures to any other student, A.M. told her that she had shown the pictures of the male to her friend, B.M., at school on the previous Monday. *See id.*; Ex. A at p. 22-24.

Langner then called Crowe, Principal of Krimmel Intermediate, to speak with him about the matter.  *See* Ex. B at ¶ 9; Ex. C at pp. 29-30; Ex. D at p. 21:4-9; Affidavit of Scott Crowe, attached as Exhibit F, at ¶ 3.  Considering the seriousness of the matter, and that there were also alleged photos of a nude male student on the phone, they decided to call the KISD Police Department ("KISD PD").  *See* Ex. B at ¶ 9; Ex. C at pp. 29-30; Ex. D at p. 21:4-11; Ex. F at ¶ 5.

At approximately 11:45, Langner called A.M.'s mother, Jennifer Mendoza ("Mendoza"), who informed her that she was coming to school to discuss the matter. *See* Ex. B at ¶ 10; Ex. E at p. 17:5-15. A.M. was very upset that Langner notified her mother, so Langner asked A.M.'s counselor, Susan Kopinitz ("Kopinitz"), to talk with her. *See id.* At that point, Langner locked the phone in her cabinet, Kopinitz took A.M. into her office, and Langner went to the cafeteria for lunch duty. *See id.*

At approximately 12:30 a.m., Mendoza arrived on campus. *See* Ex. B at ¶ 11. Langner, Mendoza, A.M., and Kopinitz discussed the seriousness of texting nude photos of oneself, and also about showing nude photos of another student to friends while at school. *See id.*; Ex. E at p. 17-18. Mendoza then asked A.M. and Kopinitz to leave the room so that she could see the photos. *See* Ex. A at p. 19:8-14; Ex. B at ¶ 11; Ex. E at p. 17-20. Langner then informed Mendoza that she had turned on the phone and searched the sent messages in order to determine whether A.M. was telling the truth about not sending a text message in the hallway, which would have been a violation of school policy. Ex. B at ¶ 11; Ex. E at pp. 17-18. Langner told Mendoza that the search revealed that A.M. had in fact been using her phone in the hallway at the time, and that in the process of searching the phone she also discovered the photo. *Id.* After Langer showed Mendoza one of the photos, Langner informed Mendoza that A.M. would face disciplinary consequences as a result of A.M.'s violating school policies, but that she first needed to confer with Crowe, who was off campus at the time. *See* Ex. B at ¶ 11; Ex. E at pp. 20, 22. Langner told Mendoza that she would speak with her the next day to inform her about the consequences. Ex. B at ¶ 11; Ex. E at p. 22:4-7. Langner also told

Mendoza that she had notified KISD PD about the photos and that it was possible that they would confiscate the phone. *See* Ex. B at ¶ 11. At no time during the meeting did Mendoza ever object to anything Langner had done in the course of the investigation. *Id.* Mendoza checked A.M. out of school at approximately 1:00 p.m. that day. *Id.*

Shortly after Mendoza and A.M. left campus, Officer Mansfield ("Mansfield") from the KISD PD arrived in Langner's office. *See* Ex. B at ¶ 12; Ex. C at pp. 28-30. Mansfield looked at the phone and saw the nude photos of A.M. and the nude photos of A.M.'s male friend. *Id.* Mansfield then turned the phone off and left Langner's office in order to call the District Attorney. Ex. B at ¶ 12. When he returned to Langner's office, he informed her that he was taking the phone. *Id.*

During first period the following day, Thursday, November 12th, Langner called A.M.'s friend, B.M., to the office. *See* Ex. B at ¶ 13; Ex. C at pp. 30-34. Langner asked her what the group of students was looking at on A.M.'s phone in the hallway. *Id.* B.M. told Langner that A.M. was showing them a text message from an ex-boyfriend. *Id.* When Langner asked if B.M. had seen anything else on the phone, B.M. told Langner that A.M. had shown her and J.B., another student, four photos of a nude male at school that previous Monday. *Id.* At least one of the photos was just of the male's penis. *See* Written Statements of B.M., J.B., and A.M., attached as Exhibit B-4. Langner then called J.B. to the office, and J.B. confirmed what B.M. had told her—that A.M. had shown her several pictures of a nude male during lunch that past Monday. *See* Ex. B at ¶ 13; Ex. B-4. On that same day, Langner obtained written statements regarding the incident from B.M., J.B., and A.M. *See id.*

At approximately 1:45 p.m., Langner called Mendoza to let her know that A.M. was going to be assigned to In School Suspension ("ISS") for three days—November 13, 16, and 17—and that further consequences were pending the results of her investigation and the KISD PD's investigation.  *See* Ex. B at ¶ 14; Ex. C at pp. 35-36; Ex. E at p. 22:15-20.   Langner then called A.M. into her office to inform her about the ISS assignment.  *See* Ex. B at ¶ 14.

Several days later, Mansfield informed Langner that, at the request of the prosecutor, he had turned the phone over to the Child Exploitation Division of Precinct Four.  *Id.* at ¶ 15.  The Child Exploitation division subsequently destroyed the phone due to an inability to securely wipe the phone clean of the photos at issue.  *Id.*; *see* Ex. E at 39-41; Ex. F at ¶ 5.

On Tuesday, November 17, 2009, Crowe conducted a campus level hearing on the telephone with Mendoza regarding A.M.'s misconduct at school.  *See* Ex. F at ¶ 7; Ex. D at pp. 23-24; Ex. E at p. 23:3-7.  During the hearing, Crowe reviewed the details of the incident and discussed the discipline consequences for the incident.  *See* Ex. F at ¶ 7; Ex. D at p. 23-25; Ex. E at p. 23:3-16.  Specifically, Crowe informed Plaintiff that as a result of A.M. showing other students the inappropriate photos on campus during school hours, that A.M. would be assigned to the KISD Disciplinary Alternative Education Program ("DAEP") beginning on November 20, 2009 for a period of thirty school days.[3]  *See* Ex.

---

[3] KISD's Student Handbook provides a non-inclusive list of student behavior subject to disciplinary action, including "[g]enerally incorrigible conduct."  *See* the 2009-2010 KISD Student Handbook, attached as Exhibit F-1, at p. 49.  The Handbook provides that "[t]he principal may suspend a student out of school if it is determined to be the most appropriate available punishment or to assign a student to a disciplinary alternative program, if available, for the length of time during the current school year deemed advisable."  *Id.* at p. 50.  In addition, KISD's Code of

F at ¶ 7; Notice of Alternative Class Placement, attached as Exhibit F-2; Ex. D at pp. 24-26; Ex. E at p. 23:3-7.

Plaintiff requested an appeal of the disciplinary determination, and a hearing was scheduled for December 1, 2009, at the KISD Central Office to determine whether the punishment should stand.  *See* Ex. F at ¶ 8; Notice of Appeal, attached as Exhibit F-3; Ex. D at p. 35:14-24. As a result of the hearing, Janice Marek, KISD Associate Superintendant of School Administration and the KISD Board's designee for hearing the appeal, upheld Crowe's decision to place A.M. at the KISD DEAP for the assigned thirty days.  *See* Ex. F at ¶ 8; Notice of Ms. Marek's Determination, attached as Exhibit F-4. On December 14, 2009, Marek informed Plaintiff that the KISD administration had determined that A.M.'s placement in the DEAP would end on December 18, 2009.  *See* Ex. F at ¶ 8; Notice of Amended DAEP Placement, attached as Exhibit F-5.  A.M. returned to her home campus, Krimmel Intermediate, on January 4, 2010.  *See* Ex. F at ¶ 8.

## IV.
## Summary of Argument

Defendants are entitled to summary judgment because Plaintiffs cannot establish a violation of their clearly established constitutional rights.  Plaintiffs cannot demonstrate a violation of their Fourth Amendment rights because Langner's search of A.M.'s phone

---

Conduct provides Discipline Offense categories.  *Id.* at pp. 55-57; Ex D at pp. 26-29.  Level II Offenses include, among other things: (1) "Engaging in serious or persistent acts of disobedience or disorderly behavior which may prove detrimental to the school, harmful to health and safety, and inhibiting the rights of others"; (2) "Displaying any behavior which is disruptive to the orderly process of education"; and (3) Being disrespectful toward school personnel or failing to comply with the requests of school personnel."  *Id.*  One of the disciplinary measures provided for Level II offenses includes placement in the DAEP.  *Id.*

was reasonable under the circumstances.  As shown below, Langner searched A.M.'s phone due to a reasonable suspicion that A.M. had violated a school rule, and the scope of her search was reasonably related to the circumstances that justified the search in the first place.

Morover, Plaintiffs cannot establish Crowe's supervisory liability under § 1983 because they have no evidence that Crowe failed to train Langner with respect to student searches, or that he acted with deliberate indifference to A.M.'s constitutional rights in light of a pattern of constitutional violations.  Plaintiffs also cannot establish municipal liability under § 1983 because there is no evidence that the KISD Board of Trustees enacted a policy that was the moving force of the violation of a federally protected right. To the contrary, the undisputed evidence demonstrates that KISD had enacted policies regarding student searches, and that KISD regularly trained its employees regarding the policies.  Thus, there is also no evidence that KISD was deliberately indifferent to A.M.'s constitutional rights.

In addition, Crowe and Langner are entitled to qualified immunity from Plaintiffs' constitutional claims because Plaintiffs cannot show a violation of their clearly established constitutional rights.  First, Plaintiffs cannot demonstrate that Langner's search violated their constitutional rights.  Second, the scope of reasonable searches in the school setting has not been clearly established.  Third, Crowe's and Langner's actions were objectively reasonable under the circumstances.

Furthermore, Plaintiffs' state law claims against the individual defendants should be dismissed for failure to exhaust their administrative remedies.  The Texas Education

Code requires that Plaintiffs exhaust the school district's grievance process before bringing claims against professional employees.  It is undisputed that Plaintiffs failed to initiate grievances against Crowe or Langner, who are professional employees of the District, for any of their actions connected to this lawsuit.

Crowe and Langner are also entitled to professional immunity from  Plaintiffs' state law claims under Texas Education Code Section 22.051 because their actions were incident to and within the scope of their duties and involved the exercise of judgment and discretion.  Moreover, because their actions were performed in good faith, Crowe and Langner are also entitled to official immunity from Plaintiffs' state law claims.

Finally, Plaintiffs' claims of intentional infliction of emotional distress against the individual defendants are barred because they are based on the same factual allegations as their constitutional claims.  As such, Plaintiffs cannot also pursue their IIED claims in this lawsuit.  Additionally, Plaintiffs' IIED claims should fail because they are not based on the type of outrageous conduct that would support such a claim.

**V.**
**Argument and Authorities**

**A.**    ***Plaintiffs Have Not Suffered a Constitutional Violation Because the Search of Plaintiffs' Phone was Reasonable.***

The Supreme Court has determined that a search conducted by school officials on school property is reasonable if it meets both of the following criteria: (1) the action is justified at the inception; *i.e.*, the school official has reasonable grounds for suspecting that the search will uncover evidence of a rule violation or criminal violation; and (2) the scope of the search is reasonably related to the circumstances that justified the search in

12

the first place; *i.e.*, the measures adopted are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction. *New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985).

In *T.L.O.*, the incident that gave rise to the case involved two separate searches, with the first—the search for cigarettes—providing the suspicion that gave rise to the second—the search for marijuana. 469 U.S. at 343-44. A high school teacher discovered two students smoking in a school lavatory. *Id.* at 328. One of the two girls was plaintiff, T.L.O., who at the time was a 14-year-old freshman. *Id.* Because smoking in the lavatory was a violation of a school rule, the teacher took the two girls to the principal's office. *Id.* In response to questioning by the principal, T.L.O.'s companion admitted that she had violated the rule, but T.L.O. denied that she had been smoking in the lavatory and claimed that she did not smoke at all. *Id.* The principal asked T.L.O. to come into his office and demanded to see her purse. *Id.* Opening the purse, he found a pack of cigarettes, which he removed from the purse and held before T.L.O. as he accused her of having lied to him. *Id.* As he reached into the purse for the cigarettes, the principal also noticed a package of cigarette rolling papers, which, in his experience, was closely associated with the use of marijuana. *Id.* Suspecting that a closer examination of the purse might yield further evidence of drug use, the principal proceeded to search the purse thoroughly. *Id.* The search revealed a small amount of marijuana and other evidence that implicated T.L.O. in drug dealing, including two letters. *Id.* The principal notified T.L.O.'s mother and the police, and turned the evidence of drug dealing over to the police. *Id.* The State subsequently brought delinquency charges against T.L.O. *Id.* at

13

329.  Contending that the principal's search violated the Fourth Amendment, T.L.O. moved to suppress the evidence found in her purse.  *Id.*

The Supreme Court found that the principal's search was reasonable under the circumstances for a number of reasons.  *Id.*  First, based on T.L.O.'s vehement reaction when accused of smoking, the Court found that the principal could have reasonably concluded that a search that found T.L.O.'s possession of cigarettes would be relevant to whether she was violating a school rule—smoking in the lavatory.  *Id.*  Specifically, the Court reasoned that "[t]he relevance of T.L.O.'s possession of cigarettes to the question whether she had been smoking and to the credibility of her denial that she smoked supplied the necessary 'nexus' between the item searched for and the infraction under investigation."  *Id.*  Moreover, "[the prical's] suspicion that there were cigarettes in the purse was not an 'inchoate and unparticularized suspicion or hunch'. . . rather, it was the sort of 'common-sense [conclusion] about human behavior' upon which 'practical people'—including government officials—are entitled to rely."  *Id.* at 346 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Cortez*, 449 U.S. 411, 418 (1981)) (internal citations omitted).   Finally, the Court noted that although T.L.O. might not have cigarettes with her, the requirement of reasonable suspicion does not require certainty, just sufficient probability.  *Id.*

With respect to the principal's further search for marijuana, the Court also found the search to be reasonable under the circumstances.  *Id.* at 347.  The discovery of rolling papers gave rise to a reasonable suspicion that T.L.O. was carrying marijuana, and the discovery of marijuana and other paraphernalia reasonably extended the search to the

14

zippered portion of her purse that contained the letters.  *Id.*  The evidence was also substantial enough to justify the principal in reading the letters to determine whether they contained any further evidence.  *Id.*  Thus, the Court concluded that the principal's search of T.L.O.'s purse was reasonable in all respects.  *Id.*

Here, as in *T.LO.*, Langner's search of A.M.'s phone was reasonable under the circumstances.  In the first instance, when the students huddled around A.M. saw Langner, they immediately ran off, which would cause any reasonable administrator to suspect that a rule violation might be occurring.  *See* Ex. A at pp. 11-13; Ex. B at ¶ 4; Ex. C at pp. 11-12.  More importantly, A.M.'s extreme reaction to being caught with her phone provided Langner with further reason to believe that A.M. was violating school rules with respect to her phone.  Specifically, A.M. began begging for Langner not to take her phone, and denied that she had been using it in school, just as T.L.O. also denied smoking cigarettes.  *See* Ex. B at ¶ 4; Ex. C at pp. 13-14.  Although simple possession of a phone at school was not itself a rule violation, much like possession of cigarettes in *T.L.O.*, A.M.'s vehement reaction when Langner took her phone, and Langner's own observations, provided Langner with the reasonable belief that, despite A.M.'s denials, a rule violation had in fact occurred—namely, using the phone during school hours.[4] Langner searched A.M.'s phone for proof that she had in fact violated the school's phone use policy.  *See* Ex. B at ¶ 6; Ex. C at p. 15:17-21; Ex. E at pp. 17-18.  Much like in

---

[4] KISD's cell phone policy permits possession of cell phones if they are turned off and not visible during school hours.  The cell phone policy further provides that if the student is *using* a cell phone during the school day, the school employee observing the student's *use* of the cell phone will confiscate it, and the parent will be notified that the parent may retrieve the phone after payment of a $15 administrative fee.  Ex. B-3 at p. 44.  As stated in her deposition, Langner understood the policy to only allow confiscation of a student's cell phone when the student had violated the cell phone use policy by using the cell phone during school hours.  If a student's cell phone was merely visible, but not being used, she simply told the student to put the cell phone away.  Ex. C at pp. 14-15.

*T.L.O.*, the relevance of A.M.'s possession of the phone in the hallway, coupled with her vehement reaction and denial of having used the phone, supplied Langner "the necessary nexus between the item searched for and the infraction under investigation." *See T.L.O.*, 469 U.S. at 346.

Moreover, the scope of Langner's search was also reasonable under the circumstances. Langner focused her search of A.M.'s phone on the text messages contained in the phone's "sent folder." *See* Ex. B at ¶ 7; Ex. C at pp. 18-23; Ex. E at pp. 17-18. In the course of searching the phone's sent folder for text messages sent that day, Langner came across the nude photos of A.M. that she had sent to her male friend, much like the principal in T.L.O. happened upon evidence of marijuana use when searching T.L.O.'s purse for proof that she had been smoking at school. *See* Ex. B at ¶ 7; Ex. C at pp. 20-22. Langner subsequently found a text message sent from the phone during school hours that day. Ex. B at ¶ 7; Ex. C at pp. 18-19. As soon as Langner found proof that A.M. had in fact violated school rules by texting during school hours, she stopped searching the phone. Ex. B at ¶ 7; Ex. C at pp. 18-23. Thus, the scope of Langner's search was reasonably related to the circumstances that justified the search in the first place. *See T.L.O.*, 469 U.S. at 347.

With respect to Crowe, Plaintiff Mendoza conceded in her deposition that Crowe did not himself engage in any search, but she nevertheless sued him for such "[b]ecause he is the principal of the school". *See* Ex. E at pp. 9-10, 30:13-29; Ex. F at ¶ 5. However, it is well established that "[s]upervisory officials may not be held liable under § 1983 for the actions of subordinates on theories of vicarious liability or respondeat

superior." *Winston v. City of Shreveport*, No. 10-30012, 2010 U.S. App. LEXIS 16887, at *14-15 (5th Cir. Aug. 12, 2010) (citing *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).

In order to establish supervisory liability under § 1983, Plaintiffs must demonstrate that (1) Crowe failed to supervise or train his subordinate officials; (2) a causal link exists between the failure to train or supervise and the violation of A.M.'s rights; and (3) the failure to train or supervise amounted to deliberate indifference. *Id.* The Fifth Circuit has held, with respect to the third prong, that "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," and that "for an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (internal quotation marks omitted). Additionally, "[d]eliberate indifference requires a showing of more than negligence or even gross negligence," and "[t]o satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Id.*

Here, Plaintiffs fail to offer any evidence that would tie Langner's search with any alleged failure by Crowe personally to train, supervise, or discipline his officers. To the contrary, Langner was in fact trained on KISD's policies regarding student searches. *See* Ex. C at p. 25:1-4.  KISD policy FNF (LEGAL) and KISD's Student Handbook govern searches of students their property. *See* Ex. B at ¶ 3; KISD Board Policy FNF (LEGAL)

and KISD Student Handbook, attached as Ex. B-1.  KISD regularly trained its employees regarding these policies.  *See* Ex. B at ¶ 3.  Langner attended numerous training sessions regarding the policy.  *Id.*; *see also* Klein Administrator Academy Training 2004-05, Klein Administrator Academy Agenda dated September 16, 2009 and Krimmel Administration Meeting Notes dated August 10, 2009, attached as Exhibit B-2.

As discussed above, Crowe was neither involved with nor contemporaneously aware of Langner's search of A.M.'s phone.  Likewise, Plaintiffs do not advance any evidence that Crowe was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed should KISD's search policies be followed, nor have they demonstrated that Crowe, in fact, "dr[e]w the inference." *See Winston*, 2010 LEXIS 16887, at *15-16.  Additionally, Plaintiffs fail to demonstrate any "pattern of violations." *See id.*  As such, Plaintiff's § 1983 supervisory liability claim against Crowe fails as a matter of law. *See id.*

### B.   *Plaintiffs' Claims Against the District Fail Because They Cannot Establish the Essential Elements of Municipal Liability.*

To hold a governmental entity, such as a school district, liable under 42 U.S.C. § 1983, Plaintiffs must show that: (1) a policymaker who has final policy-making authority, (2) enacted a policy that was (3) the moving force of the violation of a federally protected right.  *See Monell v. Dep't of of Social Servs.*, 436 U.S. 658, 694 (1978); *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403-04 (1997); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985); *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).  These three elements are necessary

to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself. *See Bolton v. City of Dallas Tex.*, 541 F.3d 545, 548 (5th Cir. 2008); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Thus, to hold a governmental entity liable under Section 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the governmental entity's policymaker was the moving force behind, or actual cause of, the constitutional injury. *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 578). The official policy itself must be unconstitutional or, if not, must have been adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result. *James*, 577 F.3d at 617 (quoting *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)).

Only those decisions made by officials with "final policy-making authority" are attributable to a governmental entity. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Under Texas law, final policy-making authority rests exclusively with a school district's board of trustees. TEX. EDU. CODE ANN. § 11.051; *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993). Because KISD's Board of Trustees is solely responsible for making and enforcing all policies and procedures in effect at KISD schools, KISD's liability must be premised on an unconstitutional action taken by the Board and not by any other school officials. *See Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995).

Here, Plaintiffs cannot identify any Board Policy that was the moving force behind their claimed constitutional violations.  *See Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1298 (11th Cir. 2002).  To the contrary, the KISD Board of Trustees adopted policy FNF (LEGAL) to address searches of students and their property.  *See* Ex. B at ¶ 3; Ex. B-1.  Moreover, KISD's Student Handbook contains a section that governs searches of students.  *See* Ex. B at ¶ 3; Ex. B-1.  As discussed above, KISD regularly trained its employees regarding these policies.  *See* Ex. B at ¶ 3.  Langner attended numerous training sessions regarding the policy.  *Id.*; Ex. B-2; Ex. C at p. 25:1-4.

Additionally Plaintiffs have not alleged, and cannot show that the KISD's policymaker (the KISD Board of Trustees), acted with deliberate indifference to Plaintiffs' constitutional rights.  *See* Ex. E at pp. 15-16.  The fact that the KISD Board adopted policy FNF (LEGAL) and trained its employees on the policy controverts any suggestion that the Board was deliberately indifferent to A.M.'s constitutional rights. The lack of evidence demonstrating that the District's policymaker acted with deliberate indifference provides an additional basis for granting summary judgment to KISD. *See James*, 577 F.3d at 617.

## C.     *The Individual School Defendants are Entitled to Qualified Immunity on Plaintiff's Section 1983 Claims*

Determining a public official's entitlement to qualified immunity under Section 1983 is a two-step process.  *See Siegert v. Gilley*, 500 U.S. 226 (1991); *Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).  First, a public official is entitled to qualified immunity if the plaintiff has not stated a violation of a clearly established constitutional

right.  *See Jones*, 132 F.3d at 1052.  Second, even if the public official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his or her conduct was objectively reasonable.  *Id*.  The burden is on the plaintiff to overcome both steps in the qualified immunity analysis.  *See Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir.), *cert. denied*, 512 U.S. 1207 (1994).

Qualified immunity shields government officials performing discretionary functions from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity."  *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988).  This doctrine has been recognized to protect "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to the protection of qualified immunity.  *Malley*, 475 U.S. at 341; *Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994).

### 1. The Individual Defendants have not violated a clearly established constitutional right.

Defendants Langner and Crowe are entitled to qualified immunity from plaintiff's Section 1983 claims because, as described above, Langner's search of A.M.'s phone was reasonable under the circumstances, and therefore did not violate A.M.'s Fourth

Amendment rights.  As a result, Plaintiffs cannot establish a violation of their clearly established constitutional rights in the first instance.  *See Lukan v. North Forest Indep. Sch. Dist.*, 183 F.3d 345, 347 (5th Cir. 1999), cert. denied, 529 U.S. 1019 (2000).

Moreover, with respect to A.M.'s rights under the Fourth Amendment, the scope of reasonable searches in the context of schools is far from being clearly established.  *See Safford Unified Sch. Dist. V. Redding*, 129 S. Ct. 2633, 2643 (2009).  In *Safford*, an administrator searched a 13-year-old student's backpack, bra, and underpants as a result of another student's statement that forbidden prescription and over-the-counter drugs came from the student.  *See id.* at 2637.  Because there were no reasons to suspect the drugs presented a danger or were concealed in the student's underwear, the Supreme Court held that the search violated the Constitution.  *Id.* at 2642.  Nevertheless, because there was reason to question the clarity with which the right was established, the Court found that the administrator who ordered the search was entitled to qualified immunity.  *Id.* at 2643-44.

Specifically, the Court considered that, in the context of qualified immunity, different courts had read *T.L.O.* as "a series of abstractions, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other."  *Id.* at 2643.  As such, it was "impossible 'to establish clearly the contours of a Fourth Amendment right . . . [in] the wide variety of possible school settings different from those involved in *T.L.O.*' itself."  *Id.*  The Court concluded that these differences in opinion from their own required immunity for the school officials in the case, despite its determination that the search in question was unreasonable.  *Id.*; *see also Beard v.*

*Whitmore Lake Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005) ("[T]he reasonableness standard articulated in *New Jersey v. T.L.O.*, has left courts later confronted with the issue either reluctant or unable to define what type of official conduct would be subject to a 42 U.S.C. § 1983 cause of action."). Accordingly, even if Plaintiffs here could establish a constitutional violation, which they cannot, Langner is entitled to qualified immunity because she did not violate a clearly established right.[5] *See id.*

### 2. The Individual Defendants' Conduct was Objectively Reasonable.

As described above, Langner's conduct in conducting the search of A.M.'s phone was objectively reasonable under the circumstances. With respect to Crowe, as noted above, Plaintiff Mendoza conceded in her deposition that Crowe did not himself engage in an unlawful search. *See* Ex. E at p. 30:13-29; Ex. F at ¶ 5. It is therefore uncontested that Crowe himself did not unreasonably violate A.M.'s 4th Amendment rights. *See id.* In summary, because the individual School Defendants have not engaged in any acts that are objectively unreasonable, they are entitled to qualified immunity on plaintiff's Section 1983 claim. *See Modica v. Taylor*, 465 F.3d 174, 179 (5th Cir. 2006).

---

[5] As discussed above, Crowe was not involved with the search of A.M.'s phone. Based on Plaintiffs' complaint, it appears as if the gravamen of Plaintiffs' complaint against Crowe is that he made a disciplinary decision to send A.M. to the DAEP. However, Crowe's disciplinary decision with respect to A.M. does not establish a constitutional violation. *See Nevares v. San Marcos Consol. Indep. Sch. Dist.*, No. 96-50420, 1997 U.S. App. LEXIS 14955, at *5-6 (5th Cir. Apr. 11, 1997). In any event, this Court has no jurisdiction to consider Plaintiffs' claims as they relate to the District's decision to place A.M. in the alternative education program. *See id.* (holding the court lacked jurisdiction to review student's disciplinary placement in an alternative education program); *see also Flour Bluff Indep. Sch. Dist. v. R.S.*, No. 13-05-623-CV, 2006 Tex. App. LEXIS 3031, at *9 (Tex. App.—Corpus Christi Apr. 13, 2006, no pet.) (same); *Aledo Indep. Sch. Dist. v. Reese*, 987 S.W.2d 953, 959 (Tex. App.-Fort Worth 1999, pet. denied) (same); *Hankins v. P.H.*, 1 S.W.3d 352, 354 (Tex. App.—Corpus Christi 1999, pet. denied) (same).

**D.**   ***Plaintiffs State Law Claims Against the Individual Defendants Should Be Dismissed For Failure to Exhaust Administrative Remedies.***

The Texas Education Code requires a plaintiff to first exhaust the school district's remedial process before bringing claims against its professional employees:

> A person *may not file suit* against a professional employee of a school district *unless the person has exhausted the remedies* provided by the school district for resolving the complaint.

Tex. Educ. Code § 22.0514 (Vernon 2009) (emphasis added).  A "professional employee of a school district" specifically includes superintendents, principals, teachers and supervisors.  Tex. Educ. Code § 22.051(a)(1).

At all relevant times, Langner and Crowe, as an associate principal and principal, respectively, were professional employees of KISD.  *See* Ex. B at ¶ 2; Ex. F at ¶ 2. Therefore, Plaintiffs may not file suit against them unless they first exhausted the remedies provided by KISD for resolving their complaints.  *See* Tex. Educ. Code § 22.051(a)(1).   KISD—like all school districts—provides students and parents with a grievance process for resolving complaints, which is exhausted when a student or parent pursues the grievance to a decision by the KISD school board.  *See* KISD Policy FNG (Local), attached as Exhibit F-6.  Plaintiffs do not allege (and cannot allege) that they filed a complaint under KISD's internal grievance process against Langner or Crowe for any reason, much less that they exhausted KISD's internal grievance process before bringing this suit.  *See* Ex. E at 32-33; Ex. B at ¶ 17; Ex. F at ¶ 10.[6]  Accordingly,

---

[6] Although Plaintiffs exhausted their administrative remedies with respect to challenging A.M.'s disciplinary assignment, this challenge did not address any alleged individual violations of law by Langner or Crowe, against whom Plaintiffs never filed a grievance.  However, the time for Plaintiffs to file a grievance against Langner or

Plaintiffs' state law claims against Langner and Crowe must be dismissed.  *See* Tex. Educ. Code § 22.0514; *Venegas v. Silva,* No. 11-04-00246-CV, 2006 Tex. App. LEXIS 8269, at *4-*5 (Tex. App. Eastland Sept. 21, 2006, pet. denied) (upholding dismissal of plaintiff's claims against assistant principal where plaintiff failed to exhaust administrative remedies provided by the school district's grievance policies).

**E.      *Crowe and Langner Have Professional Immunity from Plaintiffs' State Law Claims.***

Under Texas law, professional employees of a school district are entitled to broad immunity.  Tex. Educ. Code Ann. § 22.0511 (Vernon Supp. 2009).  Specifically, the Texas Education Code provides, in relevant part, that:

> (a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee . . .

*Id*.  Texas courts have concluded that the "the Legislature intended for professional school district employees to be immune from personal liability in most cases."  *Ward v. Theret*, No. 08-08-00143-CV, 2009 Tex. App. LEXIS 5490, at *7 (Tex. App.—El Paso July 15, 2009, no pet. h.)  Professional immunity attaches to an act if:  (1) the act is incident to or within the scope of the duties of the employee's position of employment; and (2) the act involves the exercise of judgment or discretion on the part of the employee.  Tex. Educ. Code Ann. § 22.0511 (Vernon Supp. 2009).  So long as "the general act from which the alleged injury arose was in furtherance of the employers'

---

Crowe has already expired.  *See* Ex. F-6 at p. 1 (providing that a grievance must be submitted within ten business days of the date that the problem or incident first occurred).

business and the objective for which the employee was employed" it is within the scope of employment. *Chessir v. Sharp*, 19 S.W.3d 502, 504-05 (Tex. App.—Amarillo 2000, no pet.) (finding that teacher was entitled to professional immunity under the Texas Education Code); *Lane v. Young*, No. 09-06-260-CV, 2007 Tex. App. LEXIS 144, at *11 (Tex. App.—Beaumont 2007, no pet.) (collecting cases reciting the general standard and applying that standard to section 22.0511 of the Texas Education Code). If the general test is "satisfied, then neither 1) the failure of the employer to expressly authorize the act, nor 2) the fact that it was performed negligently strip the act of its protective shield." *Chessir*, 19 S.W.3d at 504-05.

In short, the scope of professional immunity under the Texas Education Code encompasses any claim incident to or within the scope of a professional employee's duties except those involving allegations of excessive force, physical injury, or claims involving injuries arising from the use or operation of motor vehicles. Tex. Educ. Code Ann. § 22.0511 (Vernon Supp. 2008); *Hopkins v. Spring Indep. Sch. Dist.*, 736 S.W.2d 617, 618 (Tex. 1987) (construing section 22.0511's predecessor statute and confirming the broad scope of immunity afforded to professional school district employees); *Ward*, 2009 Tex. App. LEXIS 5490, at *7; *Davis v. Educ. Serv. Ctr. Reg. VIII*, 62 S.W.3d 890, 896-97 (Tex. App.—Texarkana 2001, no pet.) (holding that defendant is immune from civil suit "except when disciplining a student [and he] uses excessive force or negligence which results in bodily injury to the student."); *Chessir*, 19 S.W.3d at 504-05 (finding teacher entitled to professional immunity in suit involving burns received by child during a lesson involving cooking); *Enriquez v. Khouri*, 13 S.W.3d 458, 461-62, 464 (Tex.

26

App.—El Paso 2000, no pet.) (holding that allegedly defamatory statements made to the media by a Head Start Director were barred by professional immunity).

Both Langner's search of A.M.'s phone and Crowe's determination of A.M.'s punishment for showing two female students the inappropriate photos while at school fall squarely under the scope of their duties as administrators for Krimmel Intermediate.  *See* Ex. B at ¶ 16; Ex. F at ¶ 9; Ex. E at p. 15:20-25.   Administrators are charged with enforcing school rules and policies—indeed, it is difficult to imagine a more quintessential duty.   Langner's search was conducted in the course of investigating a possible rule violation.  *See* Ex. B at ¶ 6.  Crowe assigned A.M. punishment as a result of a rule violation.  *See* Ex. F at ¶ 7.  Moreover, the actions of both Langner and Crowe involved the use of judgment and discretion.  *See* Ex. B at ¶ 16; Ex. F at ¶ 9; Ex. E at pp.12-13.  Accordingly, Langner and Crowe have professional immunity from Plaintiffs' claims.[7]

### F.  *Plaintiffs' Intentional Infliction of Emotional Distress Claims Against Individual Defendants Are Barred Because They Are Duplicative of Plaintiffs Other Causes of Action.*

The Texas Supreme Court has long recognized that the intentional infliction of emotional distress is:

> . . . first and foremost, a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that

---

[7] Defendants Langner and Crowe are also entitled to official immunity from Plaintiffs' claims.  As described above, Langner's and Crowe's actions with respect to Plaintiff's claims required the exercise of judgment and discretion and were within the scope of their official authority.  Langer's and Crowe's actions were also made in good faith. See Ex. B at ¶ 16; Ex. F at ¶ 9.  As such, Langner and Crowe have official immunity from Plaintiffs' state law claims.  *See City of Palestine v. Ramirez*, 925 S.W.2d 250, 252-55 (Tex. App.—Tyler 1996, no writ); *Harris County v. Ochoa*, 881 S.W.2d 884, 887 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

> the victim has no other recognized theory of redress.  The tort's 'clear purpose . . . [is] 'to supplement existing forms of recovery by providing a cause of action for egregious conduct' that might otherwise go unremedied.

*Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447-448 (Tex. 2004) (internal citations omitted) (citing *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998).  In other words, "where the gravamen of a plaintiff's complaint is actually another tort, such as a constitutional civil rights violation . . . a cause of action for intentional infliction of emotional distress is not available."  *Burkett v. City of El Paso,* 513 F. Supp.2d 800, 825 (W.D.Tex. 2007) (quoting *Hoffmann-La Roche, 144 S.W.3d at 447-48).*

Here, Plaintiffs' IIED claims against the Defendants are based on the same operative facts as their Fourth Amendment constitutional claims.  *See* Ex. C at pp. 9-10, 30-31.  As such, Plaintiffs cannot also pursue their IIED claims in this lawsuit. *See Kincheloe v. Caudle,* No. A-09-CA-010 LY2009, U.S. Dist. LEXIS 96371 (W.D. Tex. Oct. 16, 2009) (dismissing plaintiffs' IIED claims based on the same operative facts as their Fourth Amendment claims); *Argo v. Brazoria County*, NO. G-07-488, 2008 U.S. Dist. LEXIS 39110, 2008 WL 2074075 at * 7 (S.D. Tex. May 14, 2008) (dismissing plaintiff's IIED claim since he was also pursuing constitutional claims based on the same facts); *Burkett v. City of El Paso,* 513 F. Supp.2d 800, 825 (W.D.Tex. 2007) (dismissing plaintiff's IIED claim where based on the same facts as his constitutional claims). Accordingly, Plaintiffs' IIED claims must be dismissed.

Moreover, Plaintiffs' IIED claims should fail because they are not based on the type of outrageous conduct that would support such a claim.  *C.M. v. Tomball Reg'l*

*Hosp.*, 961 S.W.2d 236, 245 (Tex. App.—Houston [1st Dist.] 1997, no writ) (Department of Human Services caseworker's rude, insensitive, and uncaring treatment of minor rape victim did not rise to level of outrageous conduct).

## VI.
## <u>Conclusion and Prayer</u>

For these reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment, deny any and all relief requested by Plaintiff, and grant Defendants their attorneys' fees and costs in accord with the Texas Education Code.

Respectfully submitted,

ROGERS, MORRIS & GROVER, LLP

_____

CLAY T. GROVER
State Bar No. 08550280
Federal I.D. No. 15064
Email:  cgrover@rmgllp.com
CHRISTOPHER M. MILLER
State Bar No. 24065752
Federal I.D. No. 1041030
Email:  cmiller@rmgllp.com
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone:    713/960-6000
Facsimile:    713/960-6025

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

David J. Manley
15201 Mason Rd., Suite 1000-211
Cypress, Texas 77433

_____

Counsel for Defendants